810 A.2d 1137 (2002)
355 N.J. Super. 530
The HOUSING AUTHORITY OF the CITY OF NEW BRUNSWICK, Acting as Redevelopment Agency, Plaintiff-Respondent,
v.
SUYDAM INVESTORS, L.L.C., Defendant-Appellant, and
Tinton Falls State Bank; the City of New Brunswick, a municipal corporation; GTL Investments, L.P.; and American Bankers Life Assurance Company of Florida, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued September 10, 2002.
Decided December 11, 2002.
*1141 James M. Turteltaub argued the cause for appellant (Carlin & Ward, attorneys; Mr. Turteltaub and John J. Reilly, Newark, on the brief).
Marvin J. Brauth argued the cause for respondent (Wilentz, Goldman & Spitzer, attorneys; Mr. Brauth and Yvonne Marcuse, of counsel and on the brief; Anna I. Monforth, Woodbridge, on the brief).
David Samson, Attorney General, attorney for amicus curiae State of New Jersey (Nancy Kaplen, Assistant Attorney General, of counsel; Maureen Hinchliffe Bonney and Dale Laster Lessne, Deputy Attorneys General, on the brief).
Before Judges SKILLMAN, LEFELT and WINKELSTEIN. *1138 *1139
*1140 The opinion of the court was delivered by SKILLMAN, P.J.A.D.
The primary issue presented by this appeal is whether a condemnor may consider the presence of environmental contamination in valuing the subject property or must value the property as if it were uncontaminated and bring a separate action for costs of cleanup under applicable environmental statutes. We conclude that environmental contamination is relevant to a valuation of property and therefore a condemnor may not be precluded from presenting appraisal evidence that the subject property's value is adversely affected by such contamination. We also conclude that a condemnor that elects to bring an environmental action against a condemnee is not entitled to an order that requires a portion of the condemnation award to be held on deposit to satisfy the condemnor's environmental claims.
This condemnation action involves three parcels of land, totaling 54,000 square feet, located on George Street and Remsen Avenue in downtown New Brunswick. When the action was filed, the property contained four older buildings that were being used for commercial and residential purposes. Plaintiff Housing Authority of the City of New Brunswick (Authority) sought to acquire the property for a redevelopment project in what is called the Lower George Street Redevelopment Area.
Before filing the action, the Authority offered the owner, defendant Suydam Investors, L.L.C. (Suydam), $972,000 for the property based on the Authority's appraisal *1142 expert's valuation. The Authority indicated that its offer was "contingent on the satisfactory environmental status of the property, as the appraisal does not take into account any environmental problems that could affect value." Suydam made a counter demand of $2,500,000.
After the parties were unable to negotiate an agreement as to the property's value, the Authority filed a complaint and declaration of taking on March 22, 2000. The complaint stated:
Plaintiff's offer of $972,000 is based upon the assumption that the Property is not subject to any matters not of record, including any assessment, cleanup requirement, penalty or reversion of title that may be imposed pursuant to any environmental statute, regulation, ordinance or other applicable environmental law.
Suydam did not oppose the taking, and on May 23, 2000, the trial court entered a final judgment appointing condemnation commissioners to value the property. On July 11, 2000, the trial court granted Suydam's motion to withdraw the $972,000 the Authority had deposited into court.
Thereafter, the Authority obtained several orders extending the time for the filing of the commissioners' report, based primarily on its need for additional time to obtain an updated appraisal report.
On March 26, 2001, the Authority moved for leave to amend its complaint for the purposes of alleging the presence of environmental contamination as a factor affecting the value of the property and reserving its right to recover environmental cleanup costs from Suydam. The Authority's motion also sought a stay of the commissioners' hearing "for a period of no more than one year, pending final resolution of all environmental liability and cost issues[.]"
Suydam opposed the motion on the ground that the Authority had unfairly withheld information concerning the alleged environmental contamination on its property. Suydam also contended that if the Authority's motion were granted, it would result in an unfair and prejudicial delay in the determination of just compensation for the taking.
The trial court granted the motion, stating in an oral opinion:
[T]he original complaint ... indicated that the offer of $972,000 is based upon certain assumptions including the property is not subject to any ... clean-up requirements....
Now [the Authority] wants to amend the complaint to ... say[,] notwithstanding what they said before, they believe that ... the property may be contaminated with asbestos and lead containing paints and that that would detract from the value of the property. So that issue goes to the valuation which is always an issue. And then they reserved the right to go after you for clean-up costs on some other areas under the Spill Act[.]
....
... They certainly have the right to come after you under the Spill Act, whether they put it in [the complaint] or not.... And the issue of what's on the property is a value issue which is the issue before the commissioners to start with.
Accordingly, the court entered an amended order on May 30, 2001, granting the Authority leave to file an amended complaint alleging the existence of environmental contamination that adversely affects the property's fair market value. The order also granted a six-month stay of the commissioners' hearing to enable the Authority to "attempt to complete its environmental investigations and commence any action that it deems necessary and appropriate to resolve all issues relating to environmental liability and for remediation costs associated with development of the *1143 subject property (the `Environmental Issues')."[1] The order further provided that "[i]f the Environmental Issues have not been fully and finally adjudicated after six (6) months, the commissioners shall determine the value of the subject property as if clean, and litigation as to the Environmental Issues shall be severed from the condemnation and continue as a separate action." The order also provided that if the commissioners' award exceeds the $972,000 Suydam has already received, the additional amount shall be deposited into court "pending final resolution of the Environmental Issues."
Suydam appeals from this order.[2] Suydam argues that the trial court erred in allowing the Authority to amend its complaint to allege that there is environmental contamination on the property. Suydam also argues that the court erred in allowing the Authority to assert that the presence of environmental contamination is a circumstance that may reduce the amount a condemnee is entitled to receive as just compensation for its property. In addition, Suydam argues that the court erred in directing that if the commissioners' award exceeds the $972,000 deposit previously withdrawn by Suydam, the excess must be deposited into court "pending final resolution of the Environmental Issues."
We affirm the part of the May 30, 2001 order that allows the Authority to file an amended complaint alleging that the value of the subject property is adversely affected by environmental contamination. We also conclude that the Authority's valuation expert may take that alleged contamination into consideration in valuing the property even if the Authority files a separate environmental action against Suydam. However, we reverse the part of the order that requires any commissioners' award in excess of the sum the Authority deposited into court to be kept on deposit pending the conclusion of any environment action the Authority may bring against Suydam.

I
First, we consider Suydam's argument that the trial court erred in allowing the Authority to file an amended complaint that adds an allegation that the value of the subject property is adversely affected by environmental contamination. Suydam contends that by failing to disclose the alleged contamination in its original complaint, the Authority violated its statutory obligation to engage in bona fide negotiations for a voluntary acquisition of the property. Suydam also contends that the Authority waived any right it may have had to assert that the property is contaminated by not making this allegation until after entry of the judgment appointing condemnation commissioners and that the Authority is barred by judicial estoppel from alleging that there is contamination on the property.
Suydam's arguments rest primarily on the part of N.J.S.A. 20:3-6 that imposes an obligation upon a condemnor to engage in bona fide negotiations for voluntary acquisition of a property before filing a complaint and the provisions of Rule 4:73-1 that govern the contents of a condemnation complaint. N.J.S.A. 20:3-6 provides in pertinent part:

*1144 [N]o action to condemn shall be instituted unless the condemnor is unable to acquire such title or possession through bona fide negotiations with the prospective condemnee, which negotiations shall include an offer in writing by the condemnor to the prospective condemnee holding the title of record to the property being condemned, setting forth the property and interest therein to be acquired, the compensation offered to be paid and a reasonable disclosure of the manner in which the amount of such offered compensation has been calculated, and such other matters as may be required by the rules.
Rule 4:73-1 provides:
The complaint shall include a statement showing the amount of compensation offered by the condemnor and a reasonable disclosure of the manner in which the amount has been calculated. Unless the court for good cause orders otherwise, reasonable disclosure by the condemnor shall include furnishing the condemnee with the map and a description of land to be acquired and identity of improvements to be acquired, if any; a statement of the full fair market value including a description of the appraisal valuation method or methods relied upon as well as a breakdown of the appraised value allocated to the land to be acquired, and improvements to be acquired, if any; and data concerning comparable sales or leases relied upon in determining the amount of compensation offered which shall include names of seller and purchaser or landlord and tenant, location of property by block, lot, street, street number, and municipality, date of sale or date and duration of lease, the consideration for the sale or amount of rent, and book and page number of the recording of the deed; and any unusual factors known to the condemnor which may affect value.
Thus, Rule 4:73-1 requires a condemnation complaint to recite the condemnor's compliance with its pre-complaint obligations under N.J.S.A. 20:3-6 to make a bona fide offer for the property and "a reasonable disclosure of the manner in which the amount of such offered compensation has been calculated." The final sentence of the rule, which was added by amendment effective January 1986, sets forth a more detailed description than N.J.S.A. 20:3-6 of the information a condemnor must disclose to the condemnee to satisfy its obligation to provide "reasonable disclosure of the manner" by which the offer was calculated. See Pressler, Current N.J. Court Rules, comment on R. 4:73-1, at 1813 (2003).
If a condemnor fails to disclose the information required by N.J.S.A. 20:3-6 and Rule 4:73-1, this will support a finding that it failed to engage in bona fide negotiations for voluntary acquisition of the subject property before filing the complaint. See State, by Comm'r of Transp. v. Town of Morristown, 129 N.J. 279, 286-88, 609 A.2d 409 (1992). In that event, the condemnee is entitled to dismissal of the complaint. State, by Comm'r of Transp. v. Carroll, 123 N.J. 308, 316, 587 A.2d 260 (1991).
Suydam contends that the alleged environmental contamination on its property constituted an "unusual factor[ ] known to the condemnor which may affect value" within the intent of Rule 4:73-1 and therefore the Authority's failure to disclose that contamination in either pre-complaint negotiations or the complaint constituted a breach of the Authority's duty to engage in good faith negotiations and now precludes the Authority from alleging that there is contamination that affects the property's fair market value.
We reject this argument for two reasons. First, the presence of possible environmental *1145 contamination was not one of the factors the Authority's appraiser considered in determining that the fair market value of Suydam's property was $972,000. The report of the Authority's original appraiser explicitly stated that "[i]n this appraisal assignment, the existence of potentially hazardous material used in the construction or maintenance of the building, such as the presence of toxic waste, which may or may not be present on the property, has not been considered." The report also stated that the appraiser assumed that Suydam's property is "free of any negative impact" with respect to the Environmental Cleanup Responsibility Act, N.J.S.A. 13:1K-6 to -14, and the Freshwater Wetlands Protection Act, N.J.S.A. 13:9B-1 to -30. Consistent with its appraiser's report, the Authority's complaint stated that "[p]laintiff's offer of $972,000.00 is based upon the assumption that the Property is not subject to any matters not of record, including any assessment, cleanup requirement, penalty or reversion of title that may be imposed pursuant to any environmental statute, regulation, ordinance or other applicable environmental law." Therefore, the Authority's obligation to make "a reasonable disclosure of the manner in which the amount of ... offered compensation [was] calculated," N.J.S.A. 20:3-6, did not include possible environmental contamination. See State, by Comm'r of Transp. v. Town of Morristown, supra, 129 N.J. at 288, 609 A.2d 409 ("[A]bsent a court order a condemnor need not disclose information unrelated to the manner of calculating the offer even in the condemnation complaint.").
Second, even if the Authority violated its "reasonable disclosure" obligation, Suydam's only remedy would be a dismissal of the complaint. State, by Comm'r of Transp. v. Carroll, supra, 123 N.J. at 316, 587 A. 2d 260. However, Suydam does not seek that relief. Instead, it seeks an order barring the Authority from introducing evidence that the value of Suydam's property is reduced by the presence of environmental contamination. N.J.S.A. 20:3-6 does not authorize such relief, which could prevent a condemnor from proving the true market value of a condemned property and confer an unjustifiable windfall upon the condemnee.
We also reject Suydam's argument that the Authority should be foreclosed from alleging that the value of Suydam's property is adversely affected by environmental contamination on the basis of waiver or judicial estoppel. Although the Authority's original complaint did not allege that there was contamination on Suydam's property, the possible presence of contamination was disclosed during pre-complaint negotiations. While those negotiations were ongoing, the Authority sent Suydam excerpts from the "Phase I" environmental assessment performed by the redeveloper's environmental consultant, which identified possible areas of contamination and asked Suydam to contact the Authority regarding the access to the property required to conduct a "Phase II" environmental assessment. These excerpts indicated that underground gasoline tanks had been maintained on the property; automobile body repair and services businesses, which would typically use hazardous substances, had been conducted on the property; a spill of a hazardous substance had occurred on an adjoining property, which could have migrated onto the property; and Suydam's property contained structures which could contain lead paint. Consequently, there is no basis for finding that the Authority possessed information concerning environmental contamination which it failed to disclose to Suydam during pretrial negotiations. Moreover, as the occupant of the property, Suydam had *1146 to have been aware of visible conditions that indicated the possible presence of contamination.
Under these circumstances, there is no factual foundation for concluding that the Authority should be precluded from alleging that there is environmental contamination on the property that adversely affects its value. Before filing its complaint, the Authority did not possess the kind of detailed information concerning the condition of Suydam's property that would be required for an appraiser to consider environmental contamination in valuing the property. Thus, the Authority did not have the "full knowledge" of the alleged contamination required to "intentionally" waive a "known right." W. Jersey Title & Guar. Co. v. Indus. Trust Co., 27 N.J. 144, 152-53, 141 A.2d 782 (1958). Moreover, the Authority never alleged that Suydam's property was not contaminated. The Authority's original complaint only stated that its offer was based on an assumption that the property was not subject to any cleanup requirement, and it moved for leave to file an amended complaint, which alleged the presence of environmental contamination, before there was any adjudication of the property's value. Consequently, the Authority did not "successfully assert" that the property was uncontaminated, contrary to its current position, as is required to preclude a party from maintaining a position on the basis of judicial estoppel. Ali v. Rutgers, 166 N.J. 280, 287, 765 A.2d 714 (2000) (quoting Kimball Int'l v. Northfield Metal Prod., 334 N.J.Super. 596, 608, 760 A.2d 794 (App.Div.2000), certif. denied, 167 N.J. 88, 769 A.2d 1051 (2001)).
We question whether the Authority was required to file an amended complaint as a prerequisite to alleging that the value of Suydam's property was adversely affected by environmental contamination. As previously discussed, the purpose of the Rule 4:73-1 requirement that a condemnation complaint identify "any unusual factors known to the condemnor which may affect value" is to assure compliance with the condemnor's pre-complaint obligation to provide the condemnee with "reasonable disclosure of the manner" in which the condemnor's offer was calculated, which is one element of a condemnor's obligation to engage in bona fide negotiations for voluntary acquisition of the property. See State, by Comm'r of Transp. v. Town of Morristown, supra, 129 N.J. at 286-88, 609 A.2d 409. Thus, once the pre-complaint stage of a condemnation proceeding has passed and a judgment appointing commissioners has been entered, the only remaining issue is value. See State, by Comm'r of Conservation & Econ. Dev. v. New Jersey Zinc Co., supra, 40 N.J. at 573, 193 A.2d 244. At this second stage of a condemnation proceeding, there is no longer any need for a condemnor to demonstrate its compliance with the pre-complaint requirement of good faith negotiations. Although a condemnor has a continuing obligation to provide the condemnee with reasonable notice of any change in the method used to value the subject property, such notice can be provided by an amended or new appraisal report and the other pre-hearing discovery required under Rule 4:73-11(b), without filing an amended complaint.
Moreover, even if the Authority were required to file an amended complaint alleging the presence of environmental contamination, it is firmly established that a condemnor is "permitted some latitude in amending a condemnation complaint." State, by Comm'r of Transp. v. Bakers Basin Realty Co., 138 N.J.Super. 33, 43, 350 A.2d 236 (App.Div.1975), aff'd o.b., 74 N.J. 103, 376 A.2d 1189 (1977). Such latitude is especially appropriate with respect to factual allegations that relate *1147 solely to valuation of the property, because a judgment appointing condemnation commissioners does not adjudicate any valuation issue. Therefore, we conclude that the trial court did not abuse its discretion in allowing the Authority to file an amended complaint alleging the presence of environmental contamination adversely affecting the value of Suydam's property.

II
We turn next to Suydam's argument that any environmental claim must be asserted in a separate action under the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.24, or other environmental statute and thus a condemnor may not rely upon environmental contamination as the basis for reducing the award to the condemnee.
Fair market value has been described by our Supreme Court as "the value that would be assigned to the acquired property by knowledgeable parties freely negotiating for its sale under normal market conditions based on all surrounding circumstances at the time of the taking." State, by Comm'r of Transp. v. Silver, 92 N.J. 507, 514, 457 A.2d 463 (1983). In determining fair market value, "all the considerations which would influence a willing buyer and a willing seller in coming to terms as to price should be laid before the trier of fact." Vill. of So. Orange v. Alden Corp., 71 N.J. 362, 368, 365 A.2d 469 (1976). "Consequently, any evidence which is reasonably probative of fair market value is admissible in a condemnation action." State, by Comm'r of Transp. v. F & J P'ship, 250 N.J.Super. 19, 26, 593 A.2d 352 (App.Div.1991).
Fair market value is not determined simply on the basis of a property's actual present use but rather its "highest and best" use. State, by Comm'r of Transp. v. Caoili, 135 N.J. 252, 260, 639 A.2d 275 (1994). The "highest and best" use has been defined as "`the use that at the time of the appraisal is the most profitable likely use,' or alternatively, `the available use and program of future utilization that produces the highest present land value' provided that `use has as a prerequisite a probability of achievement.'" County of Monmouth v. Hilton, 334 N.J.Super. 582, 587, 760 A.2d 786 (App.Div.2000) (quoting Ford Motor Co. v. Township of Edison, 127 N.J. 290, 300-01, 604 A.2d 580 (1992)), certif. denied, 167 N.J. 633, 772 A.2d 935 (2001). To constitute the "highest and best" use, a use must be "1) legally permissible, 2) physically possible, 3) financially feasible, and 4) maximally productive." Id. at 588, 760 A.2d 786.
We have previously held that environmental conditions are one of the circumstances that may affect a property's fair market value. In State, by Comm'r of Transp. v. Shein, 283 N.J.Super. 588, 596-97, 662 A.2d 1020 (App.Div.1995), certif. denied, 143 N.J. 325, 670 A.2d 1066 (1996), we recognized that the presence of wetlands would be considered by a knowledgeable party in negotiating a sales price for a property and therefore is a relevant factor in determining fair market value. We also held that even if the existence of wetlands is unknown on the date of taking, it still must be considered in determining the value of a property in a condemnation proceeding. Id. at 597-600, 662 A.2d 1020.
We see no reason to treat environmental contamination that may affect the development potential of a property, and hence its value, any differently than wetlands, steep slopes or any other physical condition on the property. Environmental contamination may adversely affect a property's value by imposing limitations on its use or requiring the expenditure of substantial money to remediate the condition. As the Connecticut Supreme Court has pointed out:

*1148 Excluding contamination evidence ... is likely to result in a fictional property valuea result that is inconsistent with the principles by which just compensation is calculated. It blinks at reality to say that a willing buyer would simply ignore the fact of contamination, and its attendant economic consequences, including specifically the cost of remediation, in deciding how much to pay for property. Contamination may affect the market value of property in a number of other ways. For example, the following factors ... may make a particular parcel less attractive to potential purchasers: (1) potential liability under various environmental statutory schemes; (2) potential litigation brought by members of the public for damages relating to the contaminants; (3) stigma to the property even after full remediation; (4) higher financing costs charged by lending institutions by virtue of the contamination; and (5) increased regulation.
[Northeast Ct. Econ. Alliance, Inc. v. ATC P'ship, 256 Conn. 813, 776 A.2d 1068, 1080-81 (2001).]
Similarly, The Tennessee Court of Appeals has observed that "the error of ... excluding... evidence [of environmental contamination] is underscored by the surreal spectacle of the State's land appraisal experts being forced to testify before the jury as if the land were uncontaminated, when they in fact knew that the surveys had found soil and water on and under the property to be contaminated." State, by Comm'r, Dep't of Transp. v. Brandon, 898 S.W.2d 224, 227 (Tenn.Ct.App.1995).
Furthermore, the presence of environmental contamination may be a relevant factor in determining a property's highest and best use, which is a prerequisite to a determination of fair market value. Thus, if a form of development that otherwise would be a property's highest and best use would require a prohibitively expensive environmental cleanup, but another use would not require such an expenditure, this circumstance could support a finding that the other use was the highest and best use.
In fact, Suydam's appraisal expert concluded that the highest and best use of the subject property was the use to which it was being put on the date of the taking, which apparently could have continued without Suydam expending any money for environmental cleanup. On the other hand, the Authority's current expert concluded that the highest and best use of the largest of Suydam's parcels would be to demolish the existing structure and develop the parcel in accordance with the existing zoning, which permits office, retail and multi-family residential uses. The Authority's expert indicated that redevelopment for such uses would require the expenditure of $311,619 for demolition costs, which would include abatement of environmental problems associated with the existing structure, plus an additional $10,000 to purchase an insurance policy providing coverage to the developer for future cleanup or liability associated with the contaminated area. Consequently, the resolution of the conflicting opinions of the parties' experts concerning the highest and best use of Suydam's property, and hence its fair market value, may require consideration of the evidence of environmental contamination.
Decisions in other jurisdictions support the conclusion that evidence of environmental contamination is relevant to a determination of fair market value in a condemnation action. See, e.g., Northeast Ct. Econ. Alliance, supra, 776 A.2d at 1080; Finkelstein v. Dep't of Transp., 656 So.2d 921, 922 (Fla.1995); Redevelopment Agency of Pomona v. Thrifty Oil Co., 4 Cal.App.4th 469, 5 Cal.Rptr.2d 687, 689 n. 9 (1992); City of Olathe v. Stott, 253 Kan. 687, 861 P.2d 1287, 1290 (1993); State, by *1149 Comm'r of Transp. v. Brandon, supra, 898 S.W.2d at 227. Although several jurisdictions have held that evidence of environmental contamination is inadmissible in a condemnation action, primarily on the theory that any claim of environmental contamination should be brought in an independent action under applicable environmental statutes, see, e.g., Dep't of Transp. v. Parr, 259 Ill.App.3d 602, 198 Ill.Dec. 557, 633 N.E.2d 19, 22-23,[3]appeal denied, 157 Ill.2d 497, 205 Ill.Dec. 159, 642 N.E.2d 1276 (1994); Aladdin, Inc. v. Black Hawk County, 562 N.W.2d 608, 614-17 (Iowa 1997); Silver Creek Drain Dist. v. Extrusions Div., Inc., 245 Mich. App. 556, 630 N.W.2d 347, 351-56 (2001), appeal granted, 644 N.W. 2d 761 (Mich. 2002), the leading treatise in the field concludes that "[a] majority of courts ... admit evidence of [environmental] contamination in the eminent domain trial." 4 Nichols on Eminent Domain § 13B.03[1], at 50 (Julius L. Sackman ed. 3d ed. rev. 2002). We are satisfied for the reasons previously stated that the majority rule is the correct one and that a condemnor may not be precluded from presenting expert appraisal evidence that environmental contamination has diminished the value of a condemned parcel.
This does not mean that a condemnor may assert a claim under the Spill Act or other environmental legislation as an additional count in a condemnation complaint. A condemnation action is purely an in rem proceeding for the acquisition and valuation of property. See State, by Comm'r of Transp. v. New Jersey Zinc Co., supra, 40 N.J. at 572-74, 193 A.2d 244. Furthermore, such an action is governed by the special procedures set forth in the Eminent Domain Act, N.J.S.A. 20:3-1 to -50, including the requirement that the value of the condemned property be determined initially by condemnation commissioners, N.J.S.A. 20:3-12. Consequently, a condemnor may not assert in personam claims against a condemnee in such a proceeding, nor may a condemnor or condemnee assert claims against third parties for environmental contamination or other physical damage to the property.
The trial of a condemnation action does not require a determination whether the condemnee or some other party is responsible for any environmental contamination. Instead, once the condemnor's right to take the property has been established, the sole issue is fair market value. State, by Comm'r of Transp. v. New Jersey Zinc Co., supra, 40 N.J. at 573-74, 193 A.2d 244. As the Connecticut Supreme Court has observed:
The condemnor is acquiring property in a given condition, and with a value based on that condition. How the property got to be that way and who is responsible has nothing to do with that determination.
[Northeast Ct. Econ. Alliance, supra, 776 A.2d at 1083 (quoting 7A Nichols on Eminent Domain § 13B at 75 n. 4 (Patrick J. Rohan & Melvin A. Reskin eds., 3d ed. rev.2000).]
Therefore, evidence of environmental contamination is only admissible insofar as it affects valuation.
It follows that a trier of fact may not "simply deduct the cost of the cleanup from a putative value of the property" without contamination in determining fair market value. Inmar Assocs., Inc. v. Borough of Carlstadt, 112 N.J. 593, 605, 549 A.2d 38 (1988); see also Northeast Ct. *1150 Econ. Alliance, supra, 776 A.2d at 1081. If a property's highest and best use does not require any environmental cleanup, the environmental contamination may have negligible, if any, impact upon valuation.[4] On the other hand, if a property cannot be put to any productive use without a cleanup, the costs of that cleanup could have a profound effect upon value. Consequently, the effect of environmental contamination upon a property's value must be determined on the basis of expert appraisal evidence. See Inmar Assoc., supra, 112 N.J. at 606-09, 549 A.2d 38.
We reject Suydam's argument that allowing the condemnor to introduce evidence of environmental contamination may subject the condemnee to "double liability" because this could result in a reduced condemnation award while leaving the condemnee exposed to liability in a subsequent environmental action. Generally, a property owner may be held liable for an environmental claim only if it was responsible for the contamination. See White Oak Funding, Inc. v. Winning, 341 N.J.Super. 294, 298-302, 775 A.2d 222 (App.Div.), certif. denied, 170 N.J. 209, 785 A.2d 437 (2001). Thus, if a predecessor in title or an owner of an adjoining property were responsible for environmental contamination on a condemnee's property, that other party, not the condemnee, ordinarily would be subject to liability under the Spill Act or other environmental legislation.[5] However, even if a third-party were responsible for the presence of environmental contamination on a property acquired by condemnation, that contamination could still reduce the property's fair market value. Consequently, the exclusion of evidence that a property has a lesser value because of environmental contamination than it would have had in pristine condition could result in a condemnee receiving an inflated award that does not represent the property's true market value. Moreover, even if the condemnee were responsible for the contamination, and the condemnor brought an environmental claim in addition to the condemnation action,[6] the condemnee could assert an equitable defense to avoid being subject to liability for the same environmental contamination that had previously reduced the amount of the condemnation award.[7] *1151 Therefore, Suydam's claim that it could be exposed to "double liability" for the alleged environmental contamination on its property is too speculative a concern to justify exclusion of evidence of that contamination in the proceeding to determine the property's fair market value.
Because the determination of the subject property's fair market value does not depend on whether the Authority has filed a separate action against Suydam under the Spill Act or other environmental statute, we reverse the part of the May 30, 2001, order which provides that if "the Environmental Issues have not been fully and finally adjudicated after six (6) months, the commissioners shall determine the value of the subject property as if clean."

III
Lastly, we consider the provision in the May 30, 2001 order that requires the amount of any condemnation award in excess of the $972,000 previously withdrawn by Suydam to be held on deposit in court "pending final resolution of the Environmental Issues."
Initially, we note that the Authority had not filed any environmental action against Suydam as of the date the May 30, 2001 order was entered.[8] Thus, the requirement that the portion of the award in excess of $972,000 be kept on deposit provided the Authority with what was, in effect, security for enforcement of a potential judgment in a possible future lawsuit. In any event, even if an environmental action had been filed, we find no authority in the Eminent Domain Act or any other legislation brought to our attention for an order barring a condemnee from withdrawing the full amount of the condemnation award.
The Act requires the condemnation commissioners to make "an award fixing and determining the compensation to be paid by the condemnor." N.J.S.A. 20:3-12(g). The award must be an amount sufficient to make the condemnee "whole." Township of W. Windsor v. Nierenberg, 150 N.J. 111, 126, 695 A.2d 1344 (1997). Thus, a condemnation award "replace[s] the land which has been earmarked for public use with equivalent public funds." Ibid. (quoting State v. Nordstrom, 54 N.J. 50, 53, 253 A.2d 163 (1969)). Unless the condemnor files a timely appeal, the award "become[s] final as of course, and ... constitute[s] a final judgment[,]" which must be paid within sixty days. N.J.S.A. 20:3-12(h).
There is no authority in the Eminent Domain Act for an order requiring a condemnation award to be held on deposit in court based on the pendency of another claim against the condemnee. Such an order would be a form of prejudgment attachment, which is authorized only under the limited circumstances set forth in the attachment statute, N.J.S.A. 2A:26-1 to -16. See Tanner Assocs. v. Ciraldo, 33 N.J. 51, 53, 161 A.2d 725 (1960). The Authority does not argue that its potential environmental claims against Suydam would entitle it to attach the condemnation award to Suydam under this statute. Therefore, there is no statutory authorization for the part of the May 30, 2001 order that requires any award to Suydam in excess of the $972,000 previously withdrawn by Suydam to be held on deposit pending the disposition of whatever environmental action the Authority may see fit to bring.
Considerations of fairness to the condemnee also support the conclusion that it *1152 may not be prevented from withdrawing the full amount of a condemnation award based on the possibility that it may be found liable to the condemnor in a separate environmental action. A condemnee has no practical way to prevent a condemnor from asserting frivolous or exaggerated environmental claims. Moreover, a substantial amount of time may be required to litigate such claims, particularly if the condemnee files a third party complaint against other parties and substantial discovery is required for resolution of the claims. If a portion of the award were retained on deposit until the conclusion of such litigation, the condemnee would be deprived of the income it could have generated from the full condemnation award for a substantial period of time. Although the condemnee would be entitled to interest on any unpaid balance when the money was eventually distributed, N.J.S.A. 20:3-31, interest may be an inadequate substitute for immediate distribution of an award to a condemnee who needs the money to purchase a new home or substitute commercial premises for continuation of a business. Therefore, if a condemnor was authorized to prevent a condemnee from withdrawing the full amount of a condemnation award based on the pendency of an environmental claim, there is a risk that the condemnor could assert an unsupportable or exaggerated environmental claim to gain unfair leverage in negotiating a settlement of both the condemnation and environmental actions.
Accordingly, we affirm the part of the May 30, 2001, order that granted the Authority leave to file an amended complaint alleging the existence of environmental contamination on Suydam's property. However, we reverse the parts of the order that direct the condemnation commissioners to value the property as if it had no environmental contamination if the Authority's potential environmental claims are not adjudicated before the hearing and that require the amount of any condemnation award in excess of the $972,000 previously withdrawn by Suydam to be held on deposit until the Authority's environmental claims are adjudicated.
NOTES
[1] We were advised that the commissioners' hearing still had not been held as of the date of oral argument.
[2] An order adjudicating the right to condemn and appointing condemnation commissioners is considered to be a final judgment that is appealable as of right. See N.J.S.A. 20:3-2(j); State, by Comm'r of Conservation & Econ. Dev. v. New Jersey Zinc Co., 40 N.J. 560, 572, 193 A.2d 244 (1963).
[3] As a result of amendments to the statutes governing eminent domain actions, Parr apparently is no longer controlling law in Illinois. See 735 Ill. Comp. Stat. 5/7-119; Illinois Eminent Domain Practice § 13.1 (Richard A. Redmond, Michele E. Sibley & Mark J. Steger (Supp.2002)).
[4] Thus, unless the condemnor's proposed use of a property constitutes its highest and best use, the fact that the condemnor must incur environmental cleanup costs to proceed with its project may not adversely affect the property's value. See Jersey City Redevelopment Agency v. Kugler, 58 N.J. 374, 379, 277 A.2d 873 (1971).
[5] If a condemnee is subject to liability for an environmental claim because hazardous substances were discharged from the property during the period of its ownership, see Marsh v. New Jersey Dept. of Envtl. Prot., 152 N.J. 137, 147-50, 703 A.2d 927 (1997), the condemnee can still seek contribution or indemnification from another party who was responsible for the presence of that contamination. See N.J.S.A. 58:10-23.11f(a)(2).
[6] If a condemnor files a separate environmental action against the condemnee, it is within the trial court's discretion to determine the order in which the commissioners' hearing and trial of the environmental action will be held. However, unless the condemnee consents, the pendency of an environmental action should not generally be grounds for a substantial delay in scheduling the commissioners' hearing to determine fair market value.
[7] If a condemnor does not introduce evidence that the value of the subject property was reduced by environmental contamination and instead reserves its right to assert an environmental claim for the costs of cleanup, there would be no basis for the condemnee asserting collateral estoppel, the entire controversy doctrine or other preclusionary defense in a subsequent environmental action. New Jersey Transit Corp. v. Cat in the Hat, LLC, 353 N.J.Super. 364, 376-78, 803 A.2d 114 (App. Div.), certif. granted, ___ N.J. ___, ___ A.2d ___ (2002); see also Restatement (Second) of Judgments § 30(2) (1982).
[8] We were advised at oral argument that the Authority still had not filed any environmental action against Suydam.